**HALL AMERICAN CENTER ASSOCIATES LIMITED PARTNERSHIP,** American Center Properties Limited Partnership, Michigan limited partnerships, and Hall Financial Group, Inc., a Delaware corporation, Plaintiffs,

**v.**

Leslie **DICK,** L. Stanford Evans, Individuals, American Town Center Associates Limited Partnership, a Michigan limited partnership, American Investment Properties, Inc., a Michigan corporation, Vestevich, Dritsas, McManus, Evans, Payne & Vlcko, a Michigan corporation, and Barbier & Tolleson, a Michigan corporation, Defendants.

Civ. A. No. 89–1018.

United States District Court, E.D. Michigan, S.D.

Dec. 19, 1989.

James E. Romzek, James A. Simpson, Simpson & Moran, Birmingham, Mich., for plaintiffs.

Stanford Evans, Vestevich, Dritsas, McManus, Evans, Payne & Vlcko, Bloomfield Hills, Mich., Michael Schwartz, Charfoos & Christensen, William Thorpe, Detroit, Mich., for defendants.

## MEMORANDUM OPINION

RALPH M. FREEMAN, Senior District Judge.

This action revolves around the American Center Building (Building) and approximately 40 of its 70 surrounding acres of undeveloped property (Land) in Southfield, Michigan.[1] The court will review the background facts and then address the various motions to dismiss filed by the defendants.[2] The court will dismiss the RICO claim if the plaintiffs do not cure certain pleading deficiencies within 30 days and will dismiss the state law claims against defendants Evans, the Vestevich firm, and the Barbier firm, as to whom no independent basis for federal jurisdiction exists.

### I. BACKGROUND

Plaintiff Hall American Center Associates Limited Partnership (Building Partnership) is a limited partnership organized under the laws of the State of Michigan, with its principal place of business in the Eastern District of Michigan. Plaintiff American Center Properties Limited Partnership (Land Partnership) is a limited partnership organized under the laws of the State of Michigan, with its principal place of business in the Eastern District of Michigan. Plaintiff Hall Financial Group, Inc. (Hall Financial) is a corporation organized under the laws of the State of Delaware, with its principal place of business in Dallas, Texas.

The American Center Building (Building) is a major metropolitan office complex, with a total gross square footage in excess of 579,000, comprised of a 25–story office building, a two-story commercial mall, and a two-level underground parking structure located on approximately 30 acres of real property in Southfield, Michigan. The Building is owned by the Building Partnership, itself comprised of three general partners and 175 limited partners located in

1. The Building and the Land are collectively referred to as the Property.

2. Defendants Dick, American Town Center Associates Limited Partnership (ATCA) and American Investment Properties, Inc. (AIP) have filed a motion for dismissal and summary judgment. The defendants have only attacked the legal sufficiency of the pleadings rather than argued that there is no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law. The court will not treat the motion as one for summary judgment under F.R.Civ.P. 56(c).

various states. Approximately 70 acres of undeveloped real estate (Land) located immediately adjacent to the Building[3] is owned by the Land Partnership, itself comprised of three general partners and 87 limited partners located in various states. The three general partners of the Building Partnership and the Land Partnership (collectively, the Partnerships) are common to those Partnerships, as is Craig Hall, their managing general partner.

Hall Financial provides day-to-day management services to the Partnerships, coordinates communications with them, and gives them advice in connection with their assets and properties. Neither Hall Financial nor any of its employees or affiliates has any authority to agree to sell the Property or to accept any terms relative to any sale. Decisions regarding the sale of the Property can only be made by Craig Hall on behalf of the Partnerships, after which there must be formal approval of a majority in interest of the Partnerships' respective limited partners.

Defendant Leslie Dick (Dick) is a citizen of the State of Michigan, a resident of the Eastern District of Michigan, and the defendant to whom most of the allegations in the complaint point. Defendant L. Stanford Evans (Evans) is a lawyer and a member of the defendant law firm Vestevich, Dritsas, McManus, Evans, Payne & Vlcko (Vestevich). Defendant American Town Center Associates Limited Partnership (ATCA) is a limited partnership organized under the laws of the State of Michigan, with its principal place of business in the Eastern District of Michigan. Defendant American Investment Properties, Inc. (AIP)

is a corporation organized under the laws of the State of Michigan, with its principal place of business in the Eastern District of Michigan. According to the complaint, "Dick owns and controls ATCA and AIP and at all times relevant to the allegations herein, ATCA was acting on the express and/or implied authority of Dick and/or AIP, and AIP was acting on the express and/or implied authority of Dick." Complaint, ¶ 21. Defendants Vestevich, a Michigan law firm, and Barbier & Tolleson (Barbier), also a Michigan law firm, have acted as legal counsel for Dick, ATCA, and AIP in matters concerning the Property.

According to the "Summary of the Complaint,"[4]

Leslie Dick has, since 1986, tried every way he could apparently imagine to buy the American Center Building ... and approximately 40 of its 70 surrounding acres of undeveloped property.... He relentlessly harassed the owners of the Property with letter proposals until his proposals were flatly rejected on a number of bases, not the least of which was that the owners simply did not want to sell to Mr. Dick (judging him financially incapable of purchasing a property of this size and value) and that the owners (i) thought that the time was not right for a sale of the Building and (ii) have themselves been more interested in a joint venture for the Land with an experienced, capable and respected developer....

Instead of accepting defeat in his efforts, Mr. Dick has, through a shell partnership and a dummy corporation,

---

3. The Land consists of 70–75 acres, some of which may be protected wetlands. According to a recent newspaper article, trees and vegetation have been cleared from the 75 acres for the development of "a $165–million retail, office, convention, hotel and apartment complex, which American Center Properties Ltd. and Hall American Center Associates have said they want to build over the next 10 years." Angel, *Developers Put Land at Risk, Southfield Says,* Detroit Free Press, Nov. 17, 1989, at 19A.

4. The court recognizes that the summary of the complaint as well as the complaint itself are replete with denigrating, adjectival characterizations; however, the court feels at liberty to

quote from the complaint for the purpose of ruling on the various motions to dismiss. Under a F.R.Civ.P. 12(b)(6) motion to dismiss, the factual allegations in the complaint must be accepted as true. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983), *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984). The "Summary of Complaint" is the plaintiffs' preview to the allegations in the complaint and precedes the actual allegations; the defendants are not required to answer the summary. The court quotes from the summary because it adequately highlights the allegations in the forty-page complaint.

launched a vicious and malicious campaign of (i) baseless litigation (he has filed two essentially identical lawsuits and has sought to intervene in yet another), (ii) threats and harassment (he has so harassed and interfered with a proposed joint venture with the Land that the joint venture has collapsed), (iii) intimidation (he unsuccessfully and wrongfully attempted to use the offices of the United States Attorney to pressure Plaintiffs into submission and has threatened the proposed joint venture partner with retaliatory litigation and scheduled a useless deposition of that individual) and (iv) clouding title to the Property through the filing of a welter of notices of *lis pendens.*

Mr. Dick's first lawsuit was filed in Federal District Court [Zatkoff, J.] and sought specific performance of what he claimed to be both written and oral contracts to purchase the Property, and included a count for damages based on the alleged fraud. That complaint was dismissed by summary judgment. However, within 24 hours and in what can only be viewed as blatant forum shopping, Mr. Dick filed a virtually identical complaint in the Oakland County Circuit Court seeking enforcement of the same alleged "contract" which was summarily rejected the day before by the Federal Court.[5]

In addition, Mr. Dick and his attorneys have relentlessly threatened all parties with whom the owners have sought to deal with respect to the Land, including joint venture partners and their counsel, and have even blanketed title companies with written claims of an interest in the Property.

Aside from the clear abuse of process, Mr. Dick's aim (and that of his affiliated parties) has been to freeze all dealings with the Property, in an attempt to squeeze and coerce Plaintiffs into selling the Property to Mr. Dick. . . . So far, it has worked. Plaintiffs have been rendered virtually incapable of dealing with the Property as they would otherwise have a right to do, the proposed joint venture for the Land has collapsed, the Land is now subject to a defaulted mortgage and a disappointed mortgagee, foreclosure and loss of the Land is now a real and imminent risk, and Plaintiffs are virtually isolated from any commercial dealings, except with Mr. Dick.

Importantly, this does not appear to be the first time that Mr. Dick has used these tactics to his advantage. Indeed, in 1984, Mr. Dick sought the same ends through much the same means against Pacific Mutual Life Insurance Company. However, there he succeeded in coercing Pacific Mutual into a settlement as a result of which Mr. Dick eventually received over $1 million. . . .

Thus, Plaintiffs have filed this Complaint to attack Mr. Dick's actions for what they are: (i) commercial extortion which is actionable as a civil "RICO" violation under the Federal law; (ii) slander of title; (iii) tortious interference with business relationships; and (iv) abuse of process.

Complaint, at 2–4.

## II. DEFENDANTS' MOTIONS TO DISMISS

The gist of the motions is that the RICO [6] count (Count I) fails to state a claim upon which relief can be granted. Since the other three counts are all state-law claims, the defendants also argue that the court should not exercise pendent jurisdiction over those claims. Since the majority of the parties' submissions concern the RICO count, the court will address the motions to dismiss that count first.

---

5. Apparently the one difference between the two actions is "the alleged principal on whose behalf the agents were purportedly acting (Hall 83 in the District Court Complaint and the Partnership in the Oakland County Complaint)." Plaintiffs' Response Brief, at 5 n. 5.

6. Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68 (1982 & Supp. VI 1987).

### A. Motions to Dismiss Count I

Under 18 U.S.C. § 1962(c),[7] it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.... The terms "racketeering activity," "person," "enterprise," and "pattern of racketeering activity" are defined in 18 U.S.C. § 1961 as follows:

(1) "racketeering activity" means ... (B) any act which is indictable under any of the following provisions of [18 U.S.C.]: ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), ... section 1951 (relating to interference with commerce, robbery, or extortion), ....

(3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity,....

The statute provides a private right of action for a person injured in his or her business or property because of a RICO violation, which includes the recovery of treble damages. 18 U.S.C. § 1964(c). The parties agree that to state a claim for relief under section 1962(c), a complaint must generally state four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).[8] The plaintiffs have asserted the RICO claim against defendants Dick, ATCA, and AIP, and the heart of the claim is at paragraphs 96–112 of the complaint.

Before addressing the merits of the motions to dismiss the RICO count, the court deems it prudent to reiterate the standards for ruling on a motion to dismiss brought under F.R.Civ.P. 12(b)(6):

> When evaluating a motion to dismiss pursuant to rule 12(b)(6), the factual allegations in the complaint must be regarded as true. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 174–75, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965). The claim should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

*Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983).

The RICO defendants[9] move to dismiss Count I on the ground that the plaintiffs have failed to plead the essential elements of a RICO violation. Specifically, the defendants argue that (1) the activity complained of does not constitute racketeering activity proscribed by RICO; (2) the plaintiffs failed to allege a pattern of racketeering activity; (3) the plaintiffs failed to allege an enterprise properly; (4) the plaintiffs failed to plead fraud with sufficient particularity; and (5) the plaintiffs failed to

---

**7.** After a review of the complaint, the court was unable to ascertain what provision of RICO the plaintiffs allege defendants violated. The plaintiffs' response brief states that subsection (c) was violated.

**8.** More specifically, a complaint under section 1962(c) must allege (1) a person (2) employed by or associated with (3) an enterprise engaged in or affecting interstate commerce (4) and such person conducts or participates, directly or indirectly, in that enterprise's affairs (5) through a pattern (6) of racketeering activity. *Bhatla v. Resort Development Corp.*, 720 F.Supp. 501, 510 (W.D.Pa.1989); *see Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983) (listing seven elements), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). The court will discuss the need for a more specific RICO pleading in section II(A)(1).

**9.** The principal motion and brief relating to the RICO count has been filed by defendants Dick, ATCA, and AIP, in which the other defendants have joined.

plead injury properly as well as failed to plead a conspiracy under section 1962(d).[10]

After a thorough review of the complaint, the court finds that the plaintiffs have plead, albeit not without some difficulty, the essential elements of *a* violation of section 1962(c) to withstand the defendants' arguments. However, as will be explained, the court on its own will require the plaintiffs to replead their RICO claim or claims with more specificity, following which the parties and the court will assuredly revisit many of the same arguments.

### 1. "Person" and "Enterprise"

■ The complaint alleges that Dick, ATCA, and AIP are the RICO defendants, but it does not allege that Dick, ATCA, and AIP are each "persons" under 18 U.S.C. § 1961(3) who are employed by or associated with an enterprise and who conduct or participate in that enterprise's affairs through a pattern of racketeering activity. *See* 18 U.S.C. § 1962(c); footnote 8, *supra*. Paragraph 98 of the complaint reads: "Dick, ATCA and AIP *conspired* in *an* enterprise to fraudulently misrepresent themselves to the Partnerships and Hall Financial as qualified buyers having the financing necessary to acquire the Property." (emphasis added); *see also* Complaint ¶ 99 ("Dick, ATCA and AIP have further *conspired* in *an* enterprise...." (emphasis added)). The plaintiffs' use of the term "conspired" is unavailing. First, the court does not know if the plaintiffs are attempting to allege a violation of section 1962(d) (conspiracy to violate subsection (a), (b), or

(c)) or if the term somehow pertains to a section 1962(c) violation. Second, if it pertains to section 1962(c), it hardly qualifies as alleging that each defendant was *associated with* an enterprise and *participated in* the affairs of that enterprise through a pattern of racketeering activity. *See United States v. Joseph*, 835 F.2d 1149, 1151 (6th Cir.1987) (1962(c) requires, among other elements, proof that defendant "associated with" the enterprise). Moreover, after reading the complaint the court is left with the indelible impression that Dick is the prime RICO defendant or "person." *See, e.g.,* Summary of Complaint ("Mr. Dick has, through a shell partnership and a dummy corporation, launched a vicious and malicious campaign...."; "Mr. Dick has used these tactics...."; "Plaintiffs have filed this Complaint to attack Mr. Dick's actions...."; Complaint, ¶ 21 (Dick owns and controls ATCA and AIP). Nevertheless, the plaintiffs have named ATCA and AIP as RICO "defendants," requiring the court to consider their individual liability under 1962(c).

As mentioned, the statute defines enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Although not specified in the complaint, the plaintiffs rely upon the so-called association-in-fact enterprise. Plaintiffs' Response Brief, at 12. "The [association-in-fact] enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct

---

**10.** The defendants' initial jab that RICO's aim is organized crime—consequently rendering the statute inapplicable to the commercial setting of this case—has been deflected by the Supreme Court given the statute's current language. RICO focuses upon enterprise criminality in general, and its applicability is not limited by the "criminal" status of the individual or person corrupting the enterprise. The court is well aware, however, that certain members of the Supreme Court, and a plethora of lower courts, have suggested a revisitation of RICO by Congress would be both prudent and welcome. *See, e.g., H.J. Inc. v. Northwestern Bell Telephone Co.,* —— U.S. ——, 109 S.Ct. 2893, 2909, 106 L.Ed.2d 195 (1989) (Scalia, J., concurring) ("That the

highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when [a constitutional challenge to RICO] is presented."); *The RICO Racket,* National Legal Center for the Public Interest, at 59, 63 (Sept. 1989) (comments of Justices Marshall and Rehnquist, respectively); *Sedima,* 473 U.S. at 499, 105 S.Ct. at 3286 (White, J.) ("correction must lie with Congress"); *see also The RICO Racket, id.* at 43 (criticizing RICO because of its use in practice, citing cases involving divorce, disputes between church members, between landlords and tenants, and between family members, among others).

... and is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function together as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). *Turkette* confirmed the association-in-fact enterprise and specifically held that illegitimate enterprises fall within the scope of section 1962(c).[11]

The defendants argue that the plaintiffs' use of the term "enterprise" in the complaint indicates that they have referred to enterprise as a "systematic purposeful activity" rather than as a distinct entity, rendering the enterprise allegations deficient. Although the court does not agree with the defendants' precise reasoning, the court agrees that the requisite enterprise allegations are deficient in certain respects.

Of immediate concern is the plaintiffs' indiscriminate lumping of all three RICO defendants in one count, ostensibly representing three separate RICO claims.[12] Each defendant is entitled to individual consideration and to know what enterprise it is that they are alleged to have illegally conducted through a pattern of racketeering activity. The court's statement in *Beck v. Cantor Fitzgerald & Co.*, 621 F.Supp. 1547, 1563 (N.D.Ill.1985), is applicable to this complaint:

Plaintiff's response serves only to confuse further the defects in his complaint which in turn stem from his failure to plead facts supporting and constituting each RICO claim precisely in separate counts against each separate defendant who is liable as a "person" for conducting each RICO "enterprise" through a specified "pattern of racketeering activity." As this Court has previously noted ..., "the question ... is not whether a defendant can also constitute an 'enterprise' but whether the alleged 'enterprise' has a separate and sufficiently lasting identity apart from the 'person' or 'persons' who allegedly ... are employed or associated with it...." Defendants are entitled to sufficient information to know precisely which enterprise it

**11.** *Turkette* indicated an association-in-fact enterprise: (1) must be an ongoing organization, formal or informal; (2) its members must function as a continuing unit; and (3) it must be separate "from the pattern of racketeering activity in which it engages." 452 U.S. at 583, 101 S.Ct. at 2528. The circuit courts of appeal have differed in their interpretations of the *Turkette* language. The Second, Sixth, and Eleventh Circuits, for example, require the associated members to have a common purpose and to function as a continuing unit. *See, e.g., United States v. Qaoud*, 777 F.2d 1105, 1115–16 (6th Cir.1985), *cert. denied sub nom. Callanan v. United States*, 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 899 (1986); *United States v. Mazzei*, 700 F.2d 85, 89 (2d Cir.), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); *United States v. Cagnina*, 697 F.2d 915, 920–21 (11th Cir.), *cert. denied*, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983). The Third, Fourth, and Eighth Circuits require a structure separate from the racketeering activity and distinct from the organization inherent in the pattern element. *See, e.g., United States v. Leisure*, 844 F.2d 1347, 1363–64 (8th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988); *United States v. Tillett*, 763 F.2d 628, 632 (4th Cir.1985); *United States v. Riccobene*, 709 F.2d 214, 223–24 (3rd Cir.) (three part test), *cert. denied sub nom. Ciancaglini v. United States*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). The D.C., First, Fifth, Seventh, and Ninth Circuits are unclear in their respective interpretations of *Turk-*

*ette. See, e.g., United States v. Doherty*, 867 F.2d 47, 68 (1st Cir.) (existence of enterprise inferred from nature and number of racketeering acts and participation of main figures in scheme for several years), *cert. denied*, —— U.S. ——, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989); *United States v. Feldman*, 853 F.2d 648, 655–57 (9th Cir.1988) (must show existence of organization among corporations and individuals and that organization has some continuity), *cert. denied*, —— U.S. ——, 109 S.Ct. 1164, 103 L.Ed.2d 222 (1989); *United States v. Perholtz*, 842 F.2d 343, 356–59 (D.C.Cir.) (enterprise and pattern proof need not be separate), *cert. denied*, —— U.S. ——, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988); *Manax v. McNamara*, 842 F.2d 808, 811–12 (5th Cir.1988) (enterprise structure required); *United Energy Owners Comm., Inc. v. United States Energy Management Sys., Inc.*, 837 F.2d 356, 361 (9th Cir.1988) (split in circuits noted); *United States v. Neapolitan*, 791 F.2d 489, 500 (7th Cir.), *cert. denied sub nom. Turner v. United States*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986); *United States v. Winter*, 663 F.2d 1120 (1st Cir. 1981), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983).

**12.** The court does not necessarily mean that a plaintiff cannot allege RICO claims against several defendants in one count; however, the basis for *each* defendant's liability should be clearly delineated in that count, a delineation lacking in this complaint.

**1090**

is that they are alleged to have illegally conducted through a pattern of racketeering activity. If plaintiff cannot plead a separate, lasting enterprise apart from each defendant alleged to be liable under Section 1962(c) and specify the predicate acts and conduct of that enterprise by each allegedly liable defendant with particularity, in separate counts, he has no business charging RICO violations.

This complaint only appears to allege that Dick, ATCA, and AIP, the purported RICO defendants, are an association-in-fact enterprise. The complaint states that the three defendants "conspired in an enterprise," but it does not state of what or whom that enterprise consists.[13] The plaintiffs' enterprise allegations may run afoul of the majority rule that, under 18 U.S.C. § 1962(c), the defendant or "person" cannot be the same entity as the enterprise. *See, e.g., Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 29–34 (1st Cir.1986) (defendant cannot be same entity as enterprise under 1962(c), citing cases from 2d, 3rd, 4th, 7th, 8th, and 9th Circuits). *But see United States v. Hartley*, 678 F.2d 961, 988 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). An issue arising from a further refinement of that rule is whether the enterprise can consist of a "person" whose behavior RICO was designed to punish. *See Entre Computer Centers v. FMG of Kansas City, Inc.*, 819 F.2d 1279, 1287 (4th Cir.1987) (assuming a corporation can be part of association-in-fact enterprise, it cannot combine with other entities to form an enterprise when it is already the person whose behavior the Act is designed to pun-

ish) (citing *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir. 1982) ("enterprise" refers to a being different from, not same as or part of, the person whose behavior the act was designated to punish), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983)); *von Bulow By Auersperg v. von Bulow*, 634 F.Supp. 1284, 1306 (S.D.N.Y.1985) (allegation that husband (person) conducted the affairs of an enterprise (consisting of the husband and the wife) through a pattern of racketeering activity rejected, for husband could not be both RICO person and RICO enterprise). *But see Cullen v. Margiotta*, 811 F.2d 698, 729–30 (2d Cir.) (solitary entity cannot be both person and enterprise, but it may be person and one of a number of members of an enterprise, for example, a multi-entity association), *cert. denied sub nom. Nassau County Republican Committee v. Cullen*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); *Fustok v. Conticommodity Services, Inc.*, 618 F.Supp. 1074, 1075–76 (S.D.N.Y.1985) (association-in-fact of three corporations can be enterprise even though the three corporations are also "persons" who can be liable under RICO). *Cf. Yellow Bus Lines, Inc. v. Local Union 639*, 839 F.2d 782, 791 (D.C.Cir.) (citing cases and stating "an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself"), *cert. denied*, —— U.S. ——, 109 S.Ct. 309, 102 L.Ed.2d 328 (1988); *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir.1985); *Haroco, Inc. v. American National Bank and Trust Co.*, 747 F.2d 384, 399–402 (7th Cir.1984), *aff'd on other*

---

**13.** One commentator's hypothetical illustrates the need for care in alleging the enterprise or enterprises:

Assume ... that two defendants, "X" and "Y", join in bribing public officials to gain favors for their two legitimate businesses, "X" Corporation and "Y" Corporation. At least seven enterprises can be alleged against "X" and "Y": (1) "X" is the enterprise with which "Y" is associated; (2) "Y" is the enterprise with which "X" is associated; (3) "X" and "Y" together are the enterprise; (4) "X" Corporation is the enterprise with which "X" and "Y" are associated; (5) "Y" Corporation is the enterprise with which "X" and "Y" are associated;

(6) "X" Corporation and "Y" Corporation are the enterprise with which "X" and "Y" are associated; (7) "X" Corporation, "Y" Corporation, "X" and "Y" are the enterprise. The choice of enterprise may be dictated by considerations such as venue, scope of forfeiture, and differing proof requirements.

Tarlow, *RICO: The New Darling of the Prosecutor's Nursery*, 49 Fordham L.Rev. 165, 203 (1980); *see also* Smith and Reed, *Civil RICO* ¶ 3.05, at 3–42 (1989) (noting plaintiff's freedom to plead enterprise invites confused pleadings and creates difficulty in determining plaintiff's theory of the case).

*grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).

The court does not necessarily quarrel with the plaintiffs' apparent position that Dick, ATCA, and AIP are an association-in-fact enterprise, but the court does not know, nor presumably do the defendants, if the enterprise is alleged to be the same for each RICO person. The complaint *appears* to allege that Dick associated with the enterprise of Dick, ATCA, and AIP and conducted the affairs of that enterprise through a pattern of racketeering activity (mail fraud, wire fraud, and extortion). The complaint also *appears* to allege that ATCA and AIP associated with the larger enterprise consisting of themselves and the other two RICO defendants and conducted the affairs of that enterprise through a pattern of racketeering activity. If the plaintiffs intend to allege separate RICO claims as to Dick, ATCA, and AIP, they should allege separate RICO counts in which they provide factual support for *each* RICO element as to *each* RICO defendant. *See also Citizens Savings Association v. Franciscus,* 656 F.Supp. 153, 160 (M.D.Pa.1986) ("In order to sustain a RICO claim, a plaintiff must present proof that *each* defendant was in some manner involved in the performance of the requisite predicate acts.") (emphasis in original); *United States v. Castellano,* 610 F.Supp. 1359, 1396 (S.D.N.Y.1985) ("A RICO charge under 1962(c) necessarily incorporates allegations that each of the defendants named was associated with or employed by the same enterprise, and participated in the enterprise by engaging in at least two acts of racketeering related to the enterprise."); *Eaby v. Richmond,* 561 F.Supp. 131, 135 (E.D.Pa.1983) (plaintiffs failed to allege that person committed at least two predicate racketeering acts, citing cases holding that to sustain substantive RICO claim, proof that each individual defendant committed at least two racketeering acts necessary).

The court makes these comments warily, desiring neither to instruct the plaintiffs how to plead their RICO claim or claims nor to inject itself into the case as an advocate. The court merely desires to have distinct claims as to distinct parties, enabling the court to address individual elements as to individual defendants as necessary. The complaint as drafted, lumping what appears to be three RICO claims in one count, does a disservice to the plaintiffs as well as the defendants, much less the court. However, the court is not convinced that there is no factual development that would entitle the plaintiffs to relief under section 1962(c).

Accordingly, in lieu of filing a RICO standing order, *see Civil RICO, supra,* App. 9A, at 9–48 (citing cases), or outright dismissing the case, the court will dismiss the RICO "count" unless the plaintiffs within 30 days cure the defects mentioned above in an amended complaint, which the court grants the plaintiffs leave to file. *See Beck,* 621 F.Supp. at 1563. The defendants may renew their motions to dismiss, or file additional motions, after the amended complaint is filed. In light of the leave to amend, the court will address the additional arguments raised by the defendants.

■ The defendants also contend that the plaintiffs have failed to allege that the enterprise affects interstate commerce, as is required by section 1962(c). "The law is well settled that for purposes of § 1962(c) the criminal enterprise need only have a minimal impact upon interstate commerce." *United States v. Robinson,* 763 F.2d 778, 781 (6th Cir.1985). The interstate commerce nexus requirement can be met by the racketeering activities of the enterprise. *See Bunker Ramo Corp. v. United States Business Forms, Inc.,* 713 F.2d 1272, 1289 (7th Cir.1983). In paragraph 20 of the complaint the plaintiffs allege: "The actions of Defendants complained of in this matter involved the use of interstate commerce in that Defendants have taken those actions through the use of the mails and interstate wire services, as well as other instrumentalities of interstate commerce." Paragraph 110 states: "In performing their extortionate conduct referred to in this Complaint, Dick, ATCA, and AIP have used the interstate mails and wires." The plaintiffs caption paragraph 110 with the

heading "The Affect Upon Interstate Commerce."

The court's resolution of this issue begins with the emphasis that there is not a failure to allege an effect on interstate commerce. *See Rose v. Bartle*, 871 F.2d 331, 356 (3rd Cir.1989). Given the allegation of the enterprise's effect on interstate commerce, given the minimal effect required on interstate commerce under RICO, and given the favorable interpretation the court must give the complaint under F.R.Civ.P. 12(b)(6), the court cannot say that the plaintiffs could prove no set of facts to establish the nexus between the enterprise and interstate commerce. However, the court makes this ruling with some skepticism surrounding the interstate commerce allegations. In *Gitterman v. Vitoulis*, 579 F.Supp. 423, 425–26 (S.D.N.Y. 1983), in the context of a summary judgment motion, the district court held that the intrastate use of the telephone does not establish the interstate commerce element required for a RICO violation. In *Weft, Inc. v. G.C. Investment Associates*, 630 F.Supp. 1138, 1142 (E.D.N.C.1986), *aff'd without opinion sub nom. Weft, Inc. v. Georgaide*, 822 F.2d 56 (4th Cir.1987), the district court ruled that:

> Although in plaintiff's second, third and fourth claims for relief; they allege the use of the mails to establish the jurisdictional base for the federal securities claims, these allegations are not part of the seventh claim [RICO] and, even if they were, it is doubtful that they would constitute a sufficient effect on interstate commerce under RICO.

*See also Fields v. National Republic Bank of Chicago*, 546 F.Supp. 123, 125 (N.D.Ill.1982) (allegation that defendant used mail for three letters in furtherance of scheme to defraud in violation of RICO; court ruled that no *allegation* that the alleged enterprise was engaged in, or that its activities affected, interstate commerce). *But see United States v. Barton*, 647 F.2d 224, 234 (2d Cir.) ("appellants made several interstate telephone calls to and from New York in their quest for explosive devices needed for their activities . . . .), *cert. denied*, 454 U.S. 857 [, 102 S.Ct. 307, 70

L.Ed.2d 152] (1981). In sum, the court holds that the plaintiffs' allegation of the interstate use of the mails and wires as having an effect on interstate commerce suffices to meet the pleading requirement of an effect on interstate commerce under section 1962(c).

### 2. Pattern of Racketeering Activity

The defendants next argue that the plaintiffs have failed to allege a "pattern of racketeering activity," an element that continues to spawn considerable case law, commentary, and confusion. *See, e.g., Northwestern Bell*, 109 S.Ct. at 2906 (Scalia, J., concurring). The requisite pattern of racketeering activity has two elements—racketeering activity, more commonly called predicate acts, and a pattern of that racketeering activity. The defendants focus initially on the racketeering activity, without which there could be no pattern.

#### a. Racketeering Activity

The defendants' position is that Count I amounts to nothing more than a state law claim of malicious prosecution rather than indictable predicate acts. The plaintiffs respond by arguing that the complaint alleges more than malicious prosecution or abuse of process, for the complaint alleges "the actual filing of *lawsuits* and the employment of other legal process as *part* of an overall extortionate scheme." (emphasis in original).

Paragraphs 100 and 101 of the complaint list the alleged predicate acts:

> 100. In their enterprise and scheme to fraudulently misrepresent themselves to the Partnerships and Hall Financial, Dick, ATCA and AIP repeatedly employed the use of the mails in violation of 18 U.S.C. § 1341 (mail fraud) and the wires in violation of 18 U.S.C. § 1343 (wire fraud).
>
> 101. In addition, Dick, ATCA and AIP's enterprise and scheme to file the District Court Complaint, the Oakland County Complaint, the First Notice of Lis Pendens, the Second Notice of Lis Pendens and the Amended Notice of Lis Pendens, their seeking to involve the United States

Attorney and their conduct of an improper campaign of threats of financial harm, intimidation and harassment, all for those extortionate purposes set forth earlier in this Complaint, constitutes extortion under 18 U.S.C. § 1951.

The court finds the allegations in paragraph 100 insufficient to establish predicate acts of mail and wire fraud. As the United States Court of Appeals for the Sixth Circuit stated in *Bender v. Southland Corp.*, 749 F.2d 1205, 1215–16 (6th Cir.1984):

> The crime of mail fraud has two elements: a scheme or artifice to defraud and a mailing for the purpose of executing the scheme. [citations omitted]. This court has held that the scheme to defraud must involve:
>
> > *[I]ntentional* fraud, consisting in deception *intentionally* practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end desired. [*A scheme to defraud] requires intent to deceive* or to defraud. [Emphasis supplied].
>
> *Epstein v. United States*, 174 F.2d 754, 765 (6th Cir.1949).... This court has also held that the scheme to defraud must involve "misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." [citation omitted].
>
> ... Although intent is a state of mind that may be averred generally, FRCP 9(b), it must be alleged.

The complaint in this case fails to allege even generally the defendants' intent to defraud or deceive. Moreover, the complaint does not allege what representations of material fact the defendants made to the plaintiffs upon which they relied to their detriment. *Id.* at 1216. Finally, the complaint does not meet the pleading requirement of F.R.Civ.P. 9(b), which requires that fraud be plead with particularity. "To satisfy FRCP 9(b), a plaintiff must at a minimum allege the time, place and contents of the misrepresentations upon which he relied." *Id.; see Barker v. Underwriters at Lloyd's, London*, 564 F.Supp. 352, 356 (E.D.Mich.1983). The plaintiffs fail to meet the 9(b) pleading requirement. These pleading deficiencies are equally applicable to the plaintiffs' conclusory allegation of wire fraud. *See, e.g., United States v. Lemire*, 720 F.2d 1327, 1335 (D.C.Cir.1983) (elements of mail and wire fraud statutes similar, thus cases construing the statutes helpful to interpretation of both statutes), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984). Consequently, the court will disregard the mail and wire fraud allegations as support for establishing the pleading requirement of a pattern of racketeering activity.

■ The plaintiffs also rely upon two alleged violations of the Hobbs Act, 18 U.S.C. § 1951 (extortion and attempted extortion), to establish both racketeering activity and the pattern of that activity. 18 U.S.C. § 1951 reads as follows:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
>
> (b) As used in this section—
>
> . . . .
>
> (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or *fear*, or under color of official right.

(emphasis added). Judicial construction of the Hobbs Act has not limited the Act's reach to paradigmatic racketeering activities; to the contrary, the reach of the Hobbs Act has been extended to a broad range of conduct far different from the classic case of extracting money by threats or infliction of physical harm. To establish a violation of section 1951, the plaintiffs must prove three elements: (1) that the defendants induced or attempted to in-

duce [14] his victim to part with property; (2) that they did so by "extortion"; and (3) that interstate commerce was delayed, interrupted, or adversely affected (or that would have been the result had the defendants' efforts succeeded).[15] *See* Devitt and Blackmar, *Federal Jury Practice and Instructions,* §§ 56.01 & 56.04; Pattern Jury Instructions, # 46, Criminal Cases, Eleventh Circuit (1985). The "property" element includes intangible as well as tangible property, including "the right ... to make a business decision free from outside pressure wrongfully imposed." *United States v. Santoni,* 585 F.2d 667, 673 (4th Cir. 1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979); *see United States v. Zemek,* 634 F.2d 1159, 1174 (9th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981). The plaintiffs can satisfy the extortion element by proof of the "use of fear," which is not limited to fear of force or violence—fear of economic harm is proscribed as well. *See United States v. Kattar,* 840 F.2d 118, 123 (1st Cir.1988); *United States v. Cusmano,* 659 F.2d 714, 715 (6th Cir.1981) (*Cusamo I*), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984); *Zemek,* 634 F.2d at 1174. The fear of economic harm, though, must be "actual and reasonable and [the] defendant [must know] and intentionally ... use ... such actual fear." *Cusmano,* 659 F.2d at 715. The Act covers explicit as well as implicit threats. *See United States v. Duhon,* 565 F.2d 345, 351 (5th Cir.), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978).

The plaintiffs have alleged that the defendants have affected or attempted to affect interstate commerce by extortion. The extortionate activity allegedly engaged in by the defendants was their attempt to obtain the plaintiffs' Property, with the plaintiffs' consent, but induced by their wrongful use of actual or threatened fear of economic harm should the Property not be sold on the defendants' terms. The economic harm appears to be the termination of the Joint Venture, resulting in the continuation of the mortgage default, the continuation of significant interest payments, the loss of profits expected from the venture, the potential loss of the Property, as well as the inability to deal with lenders, buyers, and joint venture partners, along with public officials, necessary to the development of the land. *See* Complaint, ¶¶ 107, 108 & 111. The economic harm allegedly resulted from the defendants' lawsuits and notices of lis pendens, along with the defendants' letters, threats, and communications to various third parties concerning the Property.

The court's analysis begins with the emphasis upon the language of the Hobbs Act itself rather than with an attempt, at least at this stage, to characterize (or mischaracterize) this case as one simply for malicious prosecution. The statutory definition of extortion is precise, and "there is persuasive evidence that Congress intended 'to make punishable all conduct falling within the reach of the statutory language.'" *United States v. Sturm,* 870 F.2d 769, 771 (1st Cir.1989) (quoting *United States v. Culbert,* 435 U.S. 371, 377, 98 S.Ct. 1112, 1115, 55 L.Ed.2d 349 (1978)).

The "wrongfulness" element of the statute has been the subject of some debate and is the element principally at issue in the dismissal motions. To distill the defendants' main point, they argue that their lawsuits and notices of lis pendens are not

---

**14.** The Hobbs Act proscribes attempted extortion as well as extortion. 18 U.S.C. § 1951(a). The plaintiffs are alleging a completed case of extortion in 1984 against Pacific Mutual and a case of attempted extortion regarding the plaintiffs' Property.

**15.** To the extent not apparent from these general elements, the court notes that the plaintiffs must prove mens rea or intent, though the level of intent that must be proven is not without some debate. *See, e.g., United States v. Furey,* 491 F.Supp. 1048, 1061 (E.D.Pa.) (extortion under Act general intent crime but noting defendant must have "general" intent to exploit the fear), *aff'd without opinion,* 636 F.2d 1211 (3rd Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 304 (1981). *But see United States v. Sturm,* 870 F.2d 769, 777 (1st Cir.1989) (discussion of general and specific intent in context of Hobbs Act prosecution); *United States v. Aguon,* 851 F.2d 1158, 1168 (9th Cir. 1988) (en banc) (lack of instruction on specific intent requires reversal).

"wrongful," for they are legitimate avenues of redress that they are entitled to pursue for alleged contractual wrongs committed by the plaintiffs. To the extent that the defendants illegitimately pursued their legal remedies, the defendants state the plaintiffs have their civil remedies of malicious prosecution and abuse of process—but not resort to RICO and the Hobbs Act.

In *United States v. Enmons*, 410 U.S. 396, 400, 93 S.Ct. 1007, 1009, 35 L.Ed.2d 379 (1973), the Supreme Court held that "wrongful" has meaning in the Hobbs Act only if it limits the statute's reach to those instances in which the obtaining of the property itself would be wrongful because the alleged extortionist has no lawful claim to the property. Justice Stewart reasoned for the majority:

> The term "wrongful," which on the face of the statute modifies the use of each of the enumerated means of obtaining property—actual or threatened force, violence, or fear—would be superfluous if it only served to describe the means used. For it would be redundant to speak of "wrongful violence" or "wrongful force" since, as the government acknowledges, any violence or force to obtain property is "wrongful." Rather, "wrongful" has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property itself would be "wrongful" because the alleged extortionist has no lawful claim to that property.

*Id.* at 399–400, 93 S.Ct. at 1009. *Enmons* interpreted "extortion" in the Hobbs Act as consisting of the use of wrongful means to achieve a wrongful objective. *See United States v. Traitz*, 871 F.2d 368, 381 (3rd Cir.1989); *United States v. Clemente*, 640 F.2d 1069, 1077 (2d Cir.1981). *Enmons* also has been interpreted as creating a claim of right defense to a charge of extortion under the Act. *See United States v. Agnes*, 753 F.2d 293, 298 (3rd Cir.1985) (even if unlawful means used (force, for example), if the defendant used force in pursuit of a legitimate claim or objective (lawful strike to obtain wages, for example), no Hobbs Act violation). *Enmons*, however, has been limited by most courts to the labor context. *See Agnes*, 753 F.2d at 298–99 (citing cases); *United States v. Russo*, 708 F.2d 209, 215 (6th Cir.), *cert. denied*, 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 682 (1983).

This case involves fear of economic harm, which presents circumstances unique from typical Hobbs Act cases. One point to be emphasized is that the threat of economic harm is not inherently wrongful. As one court put it, the "anxiety that some economic benefit or interest may be lost ... is after all the animating force of our economic system." *United States v. Sturm*, 671 F.Supp. 79, 84 (D.Mass.1987), *vacated and remanded*, 870 F.2d 769 (1st Cir.1989). Similar sentiments could be expressed of our legal system. Accordingly, courts have recognized a claim of right defense in a fear of economic harm case. In addition, courts have clarified what the "wronfulness" element means in such a case. In *Clemente*, 640 F.2d at 1077, the United States Court for the Second Circuit, in rejecting challenges to the district court's jury charge on elements of the Hobbs Act, stated:

> [The defendant] contends that the use of fear of economic harm is not inherently wrongful, but rather represents a device routinely used in legitimate business transactions, and claims that merely using fear of economic loss to obtain money does not render the receipt of such money wrongful. Thus, he asserts that the requirement set forth by the Supreme Court in *Enmons*, that both the "means" and the "objective" be wrongful to constitute extortion ..., was not adequately conveyed to the jury....
>
> We are satisfied that the charge correctly instructed the jury on the wrongfulness element of the crime on extortion. The thrust of the district court's charge ... was that the use of fear of economic loss to obtain property to which one is not entitled is wrongful. It is obvious that the use of fear of financial injury is not inherently wrongful. And precisely because of this fact, the "objective" of the party employing fear of economic loss will have a bearing on the

lawfulness of its use. . . . [T]he wrongfulness element of the crime would be satisfied upon finding that fear of economic loss was employed by the defendants to obtain money to which they were not lawfully entitled.

In *Sturm*, 870 F.2d at 774, the United States Court of Appeals for the First Circuit presented a hypothetical under the Hobbs Act that presents implications for the allegations in this case:

Two parties, A and B, enter into a contract. A sincerely believes that B has breached the contract, and threatens litigation unless B abides by A's interpretation of the contract. B refuses to do so, and the judgment in the ensuing lawsuit indicates that B had not breached the contract. May A then be convicted of attempted extortion based on the threat of litigation? We think not. Even though A had no objective right to the contractual entitlement she sought, her threat of litigation does not amount to attempted extortion because A subjectively thought she had a right to the contractual entitlement. [citations omitted]. It would be unjust to convict A of extortion *unless she knew* she had no claim to the property that she allegedly sought to extort.

(emphasis added). The court also noted that, even though most defendants will claim that they thought they were legally entitled to the property allegedly extorted, that issue is for the factfinder, who is not required to believe a particular defendant in light of all the evidence. *Id.* at 774 n. 6. The implicit thrust of *Sturm*, albeit dicta, is that a threat to sue may constitute extortion under the Hobbs Act.

As mentioned, the plaintiffs are alleging the wrongful use of economic fear to obtain property to which they are not, and know they are not, entitled. According to

the complaint, Dick initially misrepresented himself to the defendants as a renter rather than a potential buyer of the Property. He then sent a series of self-serving letters of intent in an attempt to create evidence of a contract even though he did not have money for a good faith deposit much less complete financing for a transaction of the magnitude contemplated.[16] He then filed the lawsuits and notices of lis pendens,[17] interfered with the Joint Venture, interfered with other lawsuits, threatened parties connected with the Property, and sought to involve the United States in the matter, all with the improper purposes (1) of preventing the plaintiffs from making business decisions involving the Property and (2) of forcing the plaintiffs to sell the Property to the defendants at a price below its market value. The implicit threat was that, should the plaintiffs refuse to sell the Property, the Property would be tied up in litigation, the Joint Venture would collapse, the mortgage would be foreclosed, the high interest payments would continue to be owed, and the Property would be lost completely. Viewing the allegations in the complaint as true, the court cannot say that the plaintiffs have failed to allege a predicate act under the Hobbs Act.[18]

The court does not necessarily disagree with the authority upon which the defendants rely, but the court does not find it controlling. *von Bulow By Auersperg v. von Bulow*, 657 F.Supp. 1134 (S.D.N.Y. 1987) ("a careful reading of the complaint reveals that this alleged 'scheme' amounts to nothing more than a series of acts that, taken together, state a claim for malicious prosecution"); *see I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265 (8th Cir.1984) (two threats to file civil action do not constitute pattern of racketeering activity); *Manax v. McNamara*, 660 F.Supp. 657 (W.D.Tex.1987) (initiation of lawsuits does

---

16. The plaintiffs also contend that the Property was not even on the market.

17. "[A] lis pendens is designed to warn persons who deal with property while it is in litigation that they are charged with notice of the rights of their vendor's antagonist and take subject to the judgment rendered in the litigation." *Backow-*

*ski v. Solecki*, 112 Mich.App. 401, 412, 316 N.W.2d 434 (1982).

18. The court again emphasizes the pleading problem of lumping all the RICO claims, including the predicate acts, into one count. The court is most concerned about the liability of ATCA and AIP.

not constitute scheme to defraud under mail or wire fraud statutes; nor was Hobbs Act violated), *aff'd*, 842 F.2d 808 (5th Cir.1988); *Paul S. Mullin & Associates v. Bassett*, 632 F.Supp. 532, 540 (D.Del.1986) (lawyer's act of posting letter in which he states client's legal position not mail fraud predicate for RICO); *American Nursing Care of Toledo v. Leisure*, 609 F.Supp. 419 (N.D.Ohio 1984) (threat of litigation regarding commercial agreements not criminal act and consequently not predicate act for RICO). The *von Bulow* court in particular noted that it "need not address the situation where allegedly unjustified suits form a part of some more extensive scheme of racketeering activity, such as extortion." 657 F.Supp. at 1145. As mentioned, the plaintiffs have alleged that the defendants filed the lawsuits and notices of lis pendens as *part* of an extortionate scheme to obtain property to which they are not entitled.

The *J. Lauritzen A/S* case was decided in the context of a summary judgment motion rather than, as here, on a motion to dismiss. Moreover, rather than analyzing the elements of the Hobbs Act, the court ruled that the threat to sue did not amount to extortion because the plaintiff cited no authoritative case law to support the proposition. 751 F.2d at 267.[19] The allegations in this case go further than the simple threat to sue in *J. Lauritzen A/S*. In addition, the 1989 First Circuit case of *Sturm* supports the plaintiffs' position, as do the literal elements of the Hobbs Act. *See also Kattar*, 840 F.2d at 124.

Accordingly, the court holds that, in the context of a Rule 12(b)(6) motion to dismiss, the plaintiffs' allegations—the defendants' filing of lawsuits and notices of lis pendens as part of a scheme to extort the plaintiffs' Property, which included the defendants' interference with the Joint Venture, the defendants' attempt to involve the United States Attorney in the matter, and

other harrassment of third persons involved with the Property, Property to which they knew they were not entitled—suffice to state a claim under the Hobbs Act and consequently a predicate act under RICO. The plaintiffs have alleged the defendants similarly extorted property from Pacific Mutual. The next issue is whether these two predicate acts suffice to state a pattern.

### b. Pattern of Racketeering Activity

The RICO statute defines "pattern of racketeering activity" as "at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." The mere proof of two predicate acts, however, does not establish a pattern. In *Sedima*, 473 U.S. 479, 105 S.Ct. 3275, a 5–4 decision, the Supreme Court entered into the fray of providing a meaningful formulation of the pattern requirement:

> The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." [citation omitted]. Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." [citation omitted].

*Id.* at 496 n. 14, 105 S.Ct. at 3285 n. 14 (emphasis in original); *id.* at 528, 105 S.Ct.

---

**19.** That court justifiably noted that criminal statutes are to be construed strictly and that the right to access to courts might be chilled if a threat to sue and one instance of travel for the purpose of making the threat constituted a pattern of racketeering activity. 751 F.2d at 267.

However, as in *Sturm*, the key inquiry will be the subjective claim of entitlement to the property. The pattern element is a separate matter, and the concerns of the *J. Lauritzen A/S* court are actually criticisms of RICO, the correction of which lies with Congress.

at 3289 (Powell, J, dissenting). Given the dicta emphasizing the "continuity plus relationship," the lower courts embarked upon renewed efforts to define the elusive pattern requirement. *See, e.g.*, Kalinka, *The Changing RICO Pattern Requirement By Michigan Judges*, 68 Mich.B.J. 960 (Oct. 1989) (discussing so-called "restrictive," "liberal," and "balanced" approach to pattern requirement taken by various federal judges in this state). Following a variety of lower court approaches, the Supreme Court once again attempted to assist the lower courts in *Northwestern Bell.* In that case, the United States Court of Appeals for the Eighth Circuit had held that the pattern element required an allegation and proof of multiple schemes, an approach the Court rejected.

The Court began its discussion of the pattern requirement by noting Congress intended a "flexible approach" in which "a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set." Looking to RICO's legislative history, the Court held that "to prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 109 S.Ct. at 2900 (emphasis in original). The Court next defined the elements of relatedness and continuity.

The relationship of the defendant's acts, one to another, can be shown by "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 2901 (citation omitted).

If the relatedness element is satisfied, the plaintiff must also show that the predicates amount to, or constitute a threat of, *continuing* racketeering activity. The Court rejected the notion that this continuity can be shown only by proof of multiple schemes, though it noted such proof would be "highly relevant" to the continuity in-

quiry. Rejecting a rigid approach, the Court stated:

"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. [citation omitted]. It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* at 2902 (emphasis in original). The defendants contend the allegations in this case are insufficient to constitute a pattern of racketeering activity, though neither side cited the *Northwestern Bell* case at oral argument held approximately six weeks after the case was decided.

The court finds the relatedness element sufficiently plead. The complaint alleges two extortionate "schemes" in violation of the Hobbs Act: one in 1984 against Pacific Mutual and the present one against the Partnerships. The schemes allegedly had similar purposes—an attempt to force the sale of real property with a concomitant attempt to prevent the sale of the property to another. The methods by which the extortions were allegedly perfected are similar, involving the use of the court process as part of the coercive means, along with threats and harrassment. Both of the alleged victims were sellers of real property. Finally, Dick, ATCA, and AIP are allegedly involved in both schemes.

The court also finds the continuity element sufficiently plead. Without limiting the plaintiffs to a claim of closed- or open-ended continuity, the court finds there is at least a case for open-ended continuity. The plaintiffs allege the defendants' predicate acts are a regular way of conducting their business or enterprise. *See id.* at 2902. The first Hobbs Act predicate allegedly occurred in 1984 and the start of the next predicate allegedly began in 1986. The complaint alleges that AIP is a "dummy corporation" and that ATCA, capitalized with ten dollars, is without assets. The complaint posits that Dick, ATCA, and AIP have and will continue to extort property until they are stopped, ostensibly through this suit. In addition, while recognizing the limitations of the term "scheme," the court refers to the allegations of two distinct schemes to extort property as further support for a finding of continued criminal activity or a threat of such activity in the future. The court is well aware, as the Supreme Court noted, that allegations of multiple "schemes" are of limited use because the term "scheme" is not a self-defining term. *See id.* at 2901 n. 3. This case could be viewed, for example, as involving one general scheme to extort real property. It could also be viewed as involving two distinct schemes with the threat of future distinct schemes. The plaintiffs' emphasis is upon this latter characterization involving the Pacific Mutual extortionate scheme in 1984 and the distinct, though similar, extortionate scheme involving the plaintiffs' Property from 1986 to 1989. These supportable allegations of multiple schemes, along with the allegations about the organization and affairs of the RICO enterprise and the allegations mentioned in the relatedness inquiry, suffice at the pleading stage to meet the continuity prong of the pattern requirement. Accordingly, the plaintiffs have plead a pattern of racketeering activity to withstand the defendants' current motions to dismiss.

### 3. Injury and Conspiracy

■ Contrary to the defendants' argument, the court finds that the complaint sufficiently alleges injury as a result of the alleged RICO violations. In particular, the plaintiffs allege the collapse of the Joint Venture, with all of its attendant consequences. *See* Complaint ¶ 107(ii) (plaintiffs incapable of developing land); (iii) (interest expenses, risk of foreclosure of mortgage and loss of land, defending lawsuits, loss of fair market value for land); (iv) (loss of profits, among others). The defendants' argument about the lack of conspiracy allegations may be true, but the court does not find any conspiracy even alleged in the complaint. The conspiracy arguments are moot.

### 4. Conclusion

For the above reasons, the defendants' motions to dismiss the RICO count (Count I) are DENIED. However, the court will dismiss Count I if the plaintiffs do not cure the pleading deficiencies mentioned above within 30 days in an amended complaint, which the court grants the plaintiffs leave to file.

### III. MOTIONS TO DISMISS STATE CLAIMS

■ Defendant Barbier moves to dismiss Count III (tortious interference with business relationships) on the ground that it fails to state a claim upon which relief can be granted. Barbier also moves to dismiss Count IV (abuse of process) on the same ground. All the defendants argue that the court should refuse to retain pendent jurisdiction over the state claims.

The defendants initially argued that the court should not retain jurisdiction over Counts II–IV because they are state-law claims that are not necessary to the plaintiffs' RICO cause of action. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (within court's discretion to decide pendent state-law claims, looking to factors of judicial economy, convenience, and fairness to litigants, among others). At oral argument, the defendants also relied upon the Supreme Court's recent case of *Finley v. United States*, — U.S. —, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), which was the subject of supplemental briefs. This case

involves pendent *claims* as well as pendent *parties*. *Gibbs* applies to pendent claims; *Finley* applies to pendent parties.

The initial question is whether the court should exercise pendent-claim jurisdiction over those state-law claims asserted against defendants as to whom there is an independent basis for federal jurisdiction. This court's jurisdiction is premised upon 28 U.S.C. § 1331, the plaintiffs having alleged violations of RICO, which also contains a specific jurisdictional grant. 18 U.S.C. § 1964(c). The RICO claim is brought against Dick, ATCA, and AIP, allowing the court to retain pendent jurisdiction over state-law claims against them if the RICO and state claims arise out of a common nucleus of operative fact. *Gibbs*, 383 U.S. at 727, 86 S.Ct. at 1139.

Under *Gibbs*, the court will retain pendent-claim jurisdiction of Count II (slander of title) against federal defendants Dick and ATCA; Count III (tortious interference with business relationships) against Dick and ATCA; and Count IV (abuse of process) against Dick, ATCA, and AIP. The court finds that these state-law claims are a part of the defendants' alleged extortionate schemes. The evidence with respect to the federal and state claims would without question substantially overlap, and the plaintiffs "would normally be expected to try them all in one judicial proceeding." *Id.* at 727, 86 S.Ct. at 1139.

■ Although the plaintiffs also would normally expect to try the state-law claims against defendants Evans, the Vestevich firm, and the Barbier firm, the court does not have the jurisdictional power to retain pendent-party jurisdiction over these additional state defendants. Consequently, the court will not rule on their substantive 12(b)(6) motions to dismiss the state-law claims but will dismiss the claims as to them without prejudice. The court's reasoning is as follows.

The *Finley* case, a 5–4 decision, clarified the law of pendent-party jurisdiction. In *Finley*, the petitioner filed suit against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), charging that the Federal Aviation Administration had been negligent in its operation and maintenance of runway lights and in its performance of air traffic control functions following a plane crash in which petitioner's decedents died. The petitioner then sought leave to amend her complaint to add state-law claims against both a city and a utility company as to both of whom there was no independent basis for federal jurisdiction. The district court granted the motion, asserting "pendent" jurisdiction over the parties and the claims under the *Gibbs* rationale. The court of appeals reversed, and the Supreme Court affirmed that decision, holding that the FTCA did not permit the exercise of pendent-party jurisdiction over additional parties as to whom no basis for federal jurisdiction existed. More specifically, the Court held that *Gibbs*, which applied to pendent-*claim* jurisdiction, did not extend to pendent-party jurisdiction. 109 S.Ct. at 2010.

Justice Scalia's analysis for the majority began by reiterating the two prerequisites for the creation of jurisdiction: "It remains rudimentary law that '[a]s regards all courts of the United States inferior to this tribunal, two things are necessary to create jurisdiction, whether original or appellate. The Constitution must have given to the court the capacity to take it, *and an act of Congress must have supplied it....* To the extent that such action is not taken, the power lies dormant.'" *Id.* at 2006 (emphasis in original) (citations omitted). The Court then turned to *Gibbs* and the well-established principle of pendent-claim jurisdiction. *Gibbs* held that pendent jurisdiction exists, in the sense of judicial power, when there is a claim arising under federal law and the relationship between that claim and the state claim indicates that there is but one constitutional case. 383 U.S. at 725, 86 S.Ct. at 1138. There is "but one constitutional case" when the federal and nonfederal claims derive from a common nucleus of operative fact and the plaintiff would normally expect to try them in one proceeding. The petitioner in *Finley* argued that the *Gibbs* rationale applied to her state claims against the city and the elec-

tric company and that there was but one constitutional case.

The Court ruled that *Gibbs* did not apply to such claims under the FTCA:

Analytically, petitioner's case is fundamentally different from *Gibbs* in that it brings into question what has become known as pendent-*party* jurisdiction, that is, jurisdiction over parties not named in any claim that is independently cognizable by the federal court. We may assume, without deciding, that the constitutional criterion for pendent-party jurisdiction is analogous to the constitutional criterion for pendent-claim jurisdiction, and that petitioner's state-law claims pass that test. Our cases show, however, that with respect to the additions of parties, as opposed to the addition of only claims, we will not assume that the full constitutional power has been congressionally authorized, and will not read jurisdictional statutes broadly.

Beyond a *Gibbs* inquiry, a court must examine "the posture in which the nonfederal claim is asserted and of the specific statute that confers jurisdiction over the federal claim." *Id.* 109 S.Ct. at 2007 (quoting *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 373, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978)). The significant "posture" in *Finley* was that the added claims were against parties as to whom no independent basis of federal jurisdiction existed. A further factor is the text of the jurisdictional statute at issue. The FTCA confers jurisdiction over "civil actions on claims against the United States," which the Court interpreted as meaning "against the United States and no one else." *Id.* 109 S.Ct. at 2008.

In this case, as in *Finley*, the plaintiffs are asserting state-law claims against parties as to whom there is no independent basis for federal jurisdiction. Although the state-law claims against these defendants meet the *Gibbs* test, that is not enough.[20] Moreover, the jurisdictional statutes under which this suit was brought do not provide the court with the power to assert jurisdiction over the pendent parties. 28 U.S.C. § 1331 states that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." In light of this court being a court of limited jurisdiction and the Supreme Court's admonition in *Finley* that jurisdictional statutes are not to be read broadly, the court cannot read the language of section 1331 as conferring pendent jurisdiction over a pendent party whose liability does not arise under federal law. Similarly, the court cannot read the jurisdictional grant in RICO as extending jurisdiction over pendent parties not charged under RICO. 18 U.S.C. § 1964(c) states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." This language confers jurisdiction over persons injured by RICO violations and only over those persons— "no one else." 109 S.Ct. at 2008; *see also Charles Kurz Co. v. Lombardi*, 595 F.Supp. 373, 378 (E.D.Pa.1984) ("The legislative history [of RICO] is devoid of any evidence of intent, express or implied, concerning jurisdiction over pendent parties." The court, however, decided that it had the power to decide pendent party claims but that it would not exercise its discretion to do so).

Accordingly, under *Finley*, the court does not have the jurisdictional power to decide the state-law claims against the pendent parties over whom no independent basis for federal jurisdiction exists. Neither 28 U.S.C. § 1331 nor 18 U.S.C. § 1964(c) permit such pendent-party jurisdiction. The state-law claims against Evans, Veste-

---

**20.** The court notes that, unlike the petitioner in *Finley*, the plaintiffs may not have had to file suit in federal court. *See Lou v. Belzberg*, 834 F.2d 730 (9th Cir.1987) (state and federal courts have concurrent jurisdiction over RICO claims), *cert. denied*, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988). *Contra Intel Corp. v. Hartford Accident and Indemnity Co.*, 662 F.Supp. 1507 (N.D.Calif.1987). Numerous courts have split on the issue.

vich, and Barbier will be dismissed without prejudice.[21]

## IV. CONCLUSION

This case presents serious allegations and implications under RICO. After scrutinizing the complaint and the parties' submissions under the 12(b)(6) standards, the court is not satisfied that the allegations are so deficient that no factual development would entitle the plaintiffs to relief under section 1962(c). But the court is also not satisfied with the complaint as drafted, with its combined claims against Dick, ATCA, and AIP, as well as certain vague and conclusory charges. The defendants' motions, however, also treated the allegations in the aggregate, only arguing generally a failure to allege an enterprise and a pattern of racketeering activity. The court's extended analysis of these issues is intended to goad the parties into refining their theories and arguments so that the case can either be dismissed in part or in whole or proceed upon common ground.

Accordingly, the defendants' motions to dismiss the RICO count (Count I) are DENIED WITHOUT PREJUDICE. The plaintiffs, however, will suffer dismissal of the RICO count if they do not file an amended complaint within 30 days curing the deficiencies mentioned in the memorandum insofar as F.R.Civ.P. 11 permits. The defendants may then renew their motions or file additional motions.[22] The court will also GRANT Evans, Vestevich, and Barbier's motion to dismiss the state-law claims and will DISMISS WITHOUT PREJUDICE the state-law claims as to them for lack of jurisdiction.

The plaintiffs shall submit an appropriate order approved as to form. The thirty-day period within which the plaintiffs must file an amended complaint begins upon entry of that order.

---

**21.** The court notes that the plaintiffs will now have to litigate the state-law claims in two forums unless the plaintiffs desire to dismiss their pendent claims against the federal defendants Dick, ATCA, and AIP and try all the state claims in state court. This inefficiency must obtain under *Finley.*

**22.** The defendants have filed a motion to disqualify the plaintiffs' attorneys to which the plaintiffs have filed a responsive brief. The parties shall receive a notice shortly indicating whether the court will hear oral argument or decide the matter on the briefs submitted. The plaintiffs should still proceed in accordance with this memorandum as if Simpson & Moran is the attorney of record.